IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-03226--REB-KLM

MANCHESTER PLACE HOA, INC.

Plaintiff,

vs.

OWNERS INSURANCE COMPANY, an Ohio corporation,

Defendant.

---

## OWNERS INSURANCE COMPANY'S MOTION TO STRIKE EXPERT OPINION TESTIMONY OF THOMAS IRMITER

---

Defendant, Owners Insurance Company, by and through its counsel, Karen H. Wheeler and Matthew W. Hall of Levy Wheeler Waters, P.C., pursuant to Fed.R.Civ.P. 26 and 37, and F.R.E. 702 and 703, submits the following Motion to Strike Expert Opinion Testimony of Thomas Irmiter, and states in support as follows:

<u>Certification of Conferral Pursuant to D.C.COLO.LCivR 7.1(a)</u>

Counsel for Owners conferred with counsel for Plaintiff and was advised Plaintiff opposes the relief sought herein.

## INTRODUCTION

Defendant challenges expert opinion testimony to be offered by Plaintiff's retained expert witness, Thomas Irmiter. Specifically, Defendant challenges Mr. Irmiter's cost of repair opinion, in which he opines that it would cost $641,830.83 to repair the damage to Plaintiff's property that he separately opines was caused by a storm or storms. While Defendant does not at this

1



time challenge the relevance of the opinions or Mr. Irmiter's personal credentials, Defendant challenges the sufficiency of the facts and data used in support of the opinion, the principles and methods on which the expert relied in support of the opinion, and how the expert has applied the principles and methods to the facts of the case/the data cited by Mr. Irmiter relevant to the opinion. Defendant further challenges the anticipated testimony based upon a failure to disclose both the relevant data upon which Mr. Irmiter states he relied/the bases for his opinion (and inability to disclose same, as it apparently was not preserved and no longer exists) and the manner in which Mr. Irmiter's methods were applied to that data.

The primary issue with Mr. Irmiter's cost of repair opinion is that neither Plaintiff nor Mr. Irmiter have disclosed the data underlying the estimate, making it impossible for Defendant, the Court or the jury to determine the validity of (1) the data itself; and (2) Mr. Irmiter's application of the principles he employed to that data. This not only precludes Defendant from effective cross examination of Mr. Irmiter through impeachment of the (undisclosed) data he relies upon, but also precludes meaningful analysis of Mr. Irmiter's methodologies and how any such methodologies were applied to the facts and data in this case. Further, the little information that is known about the data relied upon by Mr. Irmiter suggests it may not be reliable. In particular, Mr. Irmiter purports to rely upon three software programs, yet knew very little about them when asked at his deposition. For the reasons set forth below, Mr. Irmiter's opinions regarding the cost of repair should be stricken.

## AUTHORITES AND ARGUMENT

F.R.E. 702 permits expert witness testimony only where it consists of "scientific, technical or other specialized knowledge" that "will assist the trier of fact to understand the

evidence or to determine a fact in issue." As various courts have held, the key consideration is whether the challenged testimony will help the trier of fact in making the requisite determinations of fact. Moreover, regardless of the subject of the expert's testimony, the expert must use a reliable, articulable methodology to reach the conclusions to be offered at trial. F.R.E. 702(c). *Ipse dixit* conclusions that are not appropriately explained and supported are not helpful to the trier of fact, and therefore not admissible. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Disclosure of the basis for an expert opinion is not only affirmatively required by the Rules of Civil Procedure (see Fed.R.Civ.P. 26(a)(2)(B)(i) and (ii)) and the Rules of Evidence (F.R.E. 705), but has also been recognized to be of critical importance for purposes of fairness to the opposing party. *See Smith v. Ford*, 626 F.2d 784, 793 (10th Cir. 1980) ("advance knowledge through pretrial discovery of an expert witness's basis for his opinion is essential for effective cross-examination.") (internal quotation omitted). Likewise, this Court's Trial Preparation Conference Order expressly requires disclosure of such information. (Doc. No. 21 at ¶ 1.a.1. and 2.) Pursuant to Fed.R.Civ.P. 37(c), where a party fails to make a required disclosure, the Court may impose appropriate sanctions.

A.    *Mr. Irmiter's Report Sets Forth An Inaccurate Basis For His Cost of Repair Estimate*

The cost of repair portion of Mr. Irmiter's report offers just a single paragraph regarding his methodology in reaching the amount he opines it will cost to repair the damage he believes was caused by a storm or storms. The report states that he arrived at the pricing figures by taking the average cost provided by three separate software programs, and then making adjustments for local pricing based on information provided by local construction professionals in the area of the

property that needs to be repaired.   Specifically, Mr. Irmiter's report states as follows with

respect to his methodology:

> This estimate was compiled using data collected from the following sources:
> Exactimate, Bid For Build, and RS Means. The estimating methodology takes an
> average of the three data bases and information provided by local vendors and
> suppliers in the geographic location of the loss. The purpose of this style of
> estimate is to maximize the likelihood that a property owner will be able to have
> repairs performed by a licensed contractor in their geographic area.

*See* **Exhibit A**, Irmiter estimate at p. 1.   Exactimate, Bid for Build and RS Means are all software

programs used by various entities or individuals for preparing repair estimates.   Exhibit B,

Irmiter Deposition at 36:25 – 39:3.   However, at his deposition (taken November 29, 2016), Mr.

Irmiter testified that the statements in his report regarding how he reached his figures are not

quite accurate.

First, despite the statement in his report, he testified he did not consult with local

contractors or make any adjustments to the numbers provided by the software programs based on

such information.  See Exhibit B, Irmiter Deposition at 40:3 - 19.  Instead, it appears Mr. Irmiter

relied solely upon the software programs.

Second, despite the statement in his report that he used the average of three cost numbers

generated by three software programs, he testified that for some line items on the estimate he

prepared, he disregarded one or more of the software programs because of his belief that the

number provided was not reliable.   **Exhibit B** at 36:2 – 24.   However, he did not recall and was

unable to identify which line items contained a price derived through the disregard of one or

more software programs.   **Exhibit B** at 36:18 - 24.

Accordingly, for purposes of understanding how Mr. Irmiter truly reached his cost of

repair figure, it appears Mr. Irmiter consulted several estimating software programs, sometimes

4

taking an average of all three and sometimes using less than all three (although he does not know which line items were arrived at through using less than three), and not accounting for any data provided by local contractors.

Mr. Irmiter's inaccurate disclosure of the bases for his cost of repair opinion is in violation of Fed.R.Civ.P. 26(a)(2) and this Court's Trial Preparation Conference Order. It also, of course, left counsel for Defendant unprepared and unable to address at Mr. Irmiter's deposition the true bases for his opinions.

      B.    *Plaintiff's Disclosure of Mr. Irmiter Does Not Contain The Data He Relied Upon, and Mr. Irmiter No Longer Possesses Such Data Nor Recalls It*

Plaintiff's disclosure fails to identify the data that Mr. Irmiter relied upon in formulating his cost of repair opinions in two substantial respects, which should preclude Mr. Irmiter from offering such opinions.

First, as noted above, despite the statement in Mr. Irmiter's report that he took an average of data provided by three software programs, he testified at his deposition that he instead discarded the figure provided by one (or more) of the programs for certain line items. Plaintiff did not disclose, and Mr. Irmiter did not recall, which line items were the result of the use of something less than all three of the software programs. *See* **Exhibit B**, Irmiter Deposition at 36:2 – 24. He also disclosed no basis for discarding certain figures other than to say that in those instances he felt like the data was not accurate or reliable. *See* **Exhibit A**, Irmiter Cost of Repair Report/Estimate; see also **Exhibit B**, Irmiter Deposition at 36:2 - 24.

This problem is compounded by the second (and more) substantial respect in     which Plaintiff did not disclose the data used by Mr. Irmiter – there has been no identification or

disclosure of the actual data generated by the software programs (i.e. the price for each item as computed by the software programs) or the inputs that Mr. Irmiter used to obtain those computer generated number.  Instead, all that is provided is final "averaged" line item totals which may or may not reflect an average of the three computer software programs.  *See* **Exhibit A**.  Mr. Irmiter testified that he believes he wrote the numbers produced by each software program down on a piece of paper, but did not keep that paper.  *See* **Exhibit B**, Irmiter Deposition at 41:1 – 41:16.

As a result of these failures by Plaintiff, Defendant has no meaningful way to (1) identify which line items were the product of something other than an average of the three software numbers; (2) dispute the validity of the calculations (i.e. the math) and impeach Mr. Irmiter regarding same; (3) dispute the reasonableness or validity of the data point generated by any particular software program and impeach Mr. Irmiter regarding same; (4) dispute the appropriateness of Mr. Irmiter's decision to leave out one or more of the numbers generated by the programs for any given line item and impeach Mr. Irmiter regarding same; or (5) dispute the validity of the inputs used by Mr. Irmiter to generate the numbers produced by the software programs and impeach Mr. Irmiter regarding same.

To be certain, these are not trivial matters.  For instance, if Mr. Irmiter elected to disregard the lowest number produced by the three software programs for each line item, this would serve to artificially inflate the "average," something the jury would surely be entitled to know.  Likewise, if Mr. Irmiter used inaccurate inputs for one or more of the software programs, that could substantially change the final calculation.  Without access to the actual data, Defendant cannot know whether Mr. Irmiter (1) relied upon factually correct, reliable data; or (2) appropriately applied his methodology (inputting numbers into computer programs and taking an

average of sorts) to that data, such as where he elected not to include certain data points generated by the software programs. These issues will leave Defendant at a significant disadvantage in attempting to cross-examine Mr. Irmiter. *See Smith v. Ford*, 626 F.2d 784, 793 (10th Cir. 1980) ("advance knowledge through pretrial discovery of an expert witness's basis for his opinion is essential for effective cross-examination.") (internal quotation omitted).

As the data relied upon must be identified and disclosed, but has not and can no longer be in this case, Mr. Irmiter should not be permitted to testify.

C. *Plaintiff Has Not Disclosed Any Reliable, Testable Methodology or Basis for Mr. Irmiter To Disregard Certain Data Points Generated By The Software Programs*

With respect to the computer-generated data points that Mr. Irmiter elected to leave out of his cost of repair estimate, no reliable methodology or basis has been disclosed to support same. Rather, it appears Mr. Irmiter relied solely upon whether he felt like a particular data point was good or reasonable or valid. If he, in his sole discretion and without any identified methodology or basis, determined it was not, he simply excluded it from his analysis. There is no suggestion from Mr. Irmiter or any other source that this is a standard or accepted way of determining the cost of repair in the construction industry. Perhaps more importantly, there is no manner in which Defendant can test or verify Mr. Irmiter's determinations, even notwithstanding the fact that he does not remember and has not disclosed which line items incorporate this sort of analysis. That Mr. Irmiter "felt" it was appropriate to exclude such data is not sufficient under the Rules of Evidence. *See, e.g., Kuhmo Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999) (chronicling *Daubert* factors, rejecting "*ipse dixit*" expert conclusions and discussing the

7

importance of a reliable, testable methodology).   Accordingly, Mr. Irmiter should not be permitted to testify regarding the cost of repair.

> D.   *Neither Plaintiff Nor Mr. Irmiter Has Disclosed The Methodology Used By The Software Programs Relied Upon By Mr. Irmiter, and There Is No Evidence That At Least Two Of Those Programs Are Reliable*

Mr. Irmiter's opinion regarding the cost of repair is essentially nothing more than the numbers generated by computer programs, with certain manipulations of those numbers by Mr. Irmiter as discussed above.   Accordingly, if the software programs are not reliable or are not commonly used by experts in the industry, then Mr. Irmiter's opinion suffers from the same flaws.

Here, there is no evidence to support that "Bid for Build" and "RS Means" are reliable or commonly used by experts in the construction industry, and there has been no disclosure of the methodology used by those software programs to compute costs of repair.   Mr. Irmiter was asked about these programs at his deposition, but did not have much information about them, and acknowledged that some of them have problems and/or are not intended for use on a project like the one at issue in this lawsuit.   *See* **Exhibit B**, Irmiter Deposition at 37:21 – 40:2.   It is unknown to this Defendant how those programs work, what they take into consideration, or even what result they aim to produce.   There has been no evidence to establish that it is standard or accepted practice in the industry to (1) use these programs at all; or (2) create some average of various programs in order to establish a cost of repair.   Accordingly, it has not been established that the numbers cited by Mr. Irmiter were the product of reliable principles and methods a required under F.R.E. 702(c), or that experts in the construction field reasonably rely on such programs as required by F.R.E. 703.

8

WHEREFORE, for the foregoing reasons, Defendant requests the Court enter an Order GRANTING this motion to strike and precluding Mr. Irmiter from offering his cost of repair opinion pursuant to F.R.E. 702 & 703, and Fed.R.Civ.P. 26 and 37.

Date: December 13th, 2016.

Respectfully submitted,

s/     *Matthew W. Hall*
Karen H. Wheeler
Matthew W. Hall
LEVY•WHEELER•WATERS, P.C.
Peakview Tower, Suite 650
6465 Greenwood Plaza Boulevard
Englewood, Colorado 80111
Telephone:     (303) 796-2900
Facsimile:      (303) 796-2081

Attorney for Defendant Owners Insurance Company

9



**Forensic Building Science, Inc.**

**Forensic Building Science, Inc.**
595 Selby Avenue
Saint Paul, MN 55102
651-222-6509
www.forensicbuildingscience.com

# Preliminary Estimate

| Property Information | Project Information |
|---|---|
| Manchester Place HOA<br>1379, 1389, & 1399 S. Idalia St. and 15504,<br>15554, 15564, 15579 & 15584 E Wyoming Dr.<br>Aurora, CO 80017<br>Date Prepared: September 16, 2014<br>Estimate Approved By: Tom Irmiter | Type of Loss: Hail and Wind<br><br>Insurance Provider: Auto Owners Insurance<br>Claim #: 74-4230-13<br>Policy #: 134632-74064970-13<br>Estimate Prepared By: Jim Irmiter |

This estimate was compiled using data collected from the following sources: Exactimate, Bid For Build, and RS Means. The estimating methodology takes an average of the three data bases and information provided by local vendors and suppliers in the geographic location of the loss. The purpose of this style of estimate is to maximize the likelihood that a property owner will be able to have repairs performed by a licensed contractor in their geographic area.

## 1379 South Idalia Street - Roof

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Metal Flashing** | | | | |
| 1 | R & R Drip Edge | 508 L.F. | $1.88 | | $955.04 |
| 2 | R & R End Wall | 46 L.F. | $5.83 | | $268.18 |
| 3 | R & R Side Wall | 50 L.F. | $4.94 | | $247.00 |
| | **Roof Penetrations** | | | | |
| 4 | R & R Roof Jack | 9 Ea. | $65.00 | | $585.00 |
| 5 | R & R Turtle Vent | 12 Ea. | $79.85 | | $958.20 |
| 6 | R & R Furnace Vent (Small) | 2 Ea. | $69.00 | | $138.00 |
| 7 | R & R Furnace Vent (Medium) | 2 Ea. | $99.00 | | $198.00 |
| | **Underlayment** | | | | |
| 8 | R & R 15# | 50 Sq. | $24.00 | | $1,200.00 |
| 9 | Ice and Water Shield | 1524 S.F. | $1.69 | | $2,575.56 |
| | **Composite Architectural Shingle** | | | | |
| 10 | R & R Laminated- 25 Year | 50 Sq. | $239.00 | | $11,950.00 |
| 11 | Add Nailing Cost For Mansard Roof | 1 Ea. | 10.00% | | $1,195.00 |
| 12 | Add For Hand Sealing | 5 Sq. | $40.25 | | $201.25 |
| | **Aluminum Gutters** | | | | |
| 13 | R & R Gutters & Downspouts | 254 L.F. | $8.20 | | $2,082.80 |
| 14 | Paint Gutters - 2 Coats | 254 L.F. | $1.04 | | $264.16 |
| | **Aluminum Soffits** | | | | |
| 15 | R & R 12" - No Fascia | 254 L.F. | $1.69 | | $429.26 |

|  | 1379 South Idalia Street - Roof Sub-Total: | | | $23,247.45 | |

## 1379 South Idalia Street - Exterior

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Aluminum Siding** | | | | |
| 16 | R & R 8" Non-Insulated | 1036 S.F. | $5.12 | | $5,304.32 |
| 17 | R & R WRB - Tyvek | 1036 S.F. | $0.71 | | $735.56 |
| | **Aluminum Trim** | | | | |

**EXHIBIT A**

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| 18 | R & R Aluminum Trim | 340 L.F. | $1.69 | | $574.60 |
| | **Balcony** | | | | |
| 19 | R & R Treated Railing and Trim - 2" x 2" | 28 L.F. | $2.10 | | $58.80 |
| | **Site Work** | | | | |
| | Fencing | | | | |
| 20 | R & R Red Cedar Fencing- 6' | 75 L.F. | $41.85 | | $3,138.75 |
| | **Air Conditioning** | | | | |
| 21 | R & R 2.5 Ton Self Contained Unit | 4 Ea. | $3,555.00 | | $14,220.00 |

### 1379 South Idalia Street - Exterior
### Sub-Total: $24,032.03

## 1389 South Idalia Street - Roof

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Metal Flashing** | | | | |
| 22 | R & R Drip Edge | 508 L.F. | $1.88 | | $955.04 |
| 23 | R & R End Wall | 46 L.F. | $5.83 | | $268.18 |
| 24 | R & R Side Wall | 50 L.F. | $4.94 | | $247.00 |
| | **Roof Penetrations** | | | | |
| 25 | R & R Roof Jack | 9 Ea. | $65.00 | | $585.00 |
| 26 | R & R Turtle Vent | 12 Ea. | $79.85 | | $958.20 |
| 27 | R & R Furnace Vent (Medium) | 6 Ea. | $99.00 | | $594.00 |
| | **Underlayment** | | | | |
| 28 | R & R 15# | 50 Sq. | $24.00 | | $1,200.00 |
| 29 | Ice and Water Shield | 1524 S.F. | $1.69 | | $2,575.56 |
| | **Composite Architectural Shingle** | | | | |
| 30 | R & R Laminated- 25 Year | 50 Sq. | $239.00 | | $11,950.00 |
| 31 | Add Nailing Cost For Mansard Roof | 1 Ea. | 10.00% | | $1,195.00 |
| 32 | Add For Hand Sealing | 5 Sq. | $40.25 | | $201.25 |
| | **Aluminum Gutters** | | | | |
| 33 | R & R Gutters & Downspouts | 254 L.F. | $8.20 | | $2,082.80 |
| 34 | Paint Gutters - 2 Coats | 254 L.F. | $1.04 | | $264.16 |
| | **Aluminum Soffits** | | | | |
| 35 | R & R 12" - No Fascia | 254 L.F. | $1.69 | | $429.26 |

### 1389 South Idalia Street - Roof Sub-
### Total: $23,505.45

## 1389 South Idalia Street - Exterior

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Aluminum Siding** | | | | |
| 36 | R & R 8" Non-Insulated | 1036 S.F. | $5.12 | | $5,304.32 |
| 37 | R & R WRB - Tyvek | 1036 S.F. | $0.71 | | $735.56 |
| | **Aluminum Trim** | | | | |
| 38 | R & R Aluminum Trim | 340 L.F. | $1.69 | | $574.60 |
| | **Balcony** | | | | |
| 39 | R & R Treated Railing and Trim - 2" x 2" | 28 L.F. | $2.10 | | $58.80 |
| | **Site Work** | | | | |
| | Fencing | | | | |
| 40 | R & R Red Cedar Fencing- 6' | 75 L.F. | $41.85 | | $3,138.75 |
| | **Air Conditioning** | | | | |
| 41 | R & R 2.5 Ton Self Contained Unit | 4 Ea. | $3,555.00 | | $14,220.00 |

### 1389 South Idalia Street - Exterior
### Sub-Total: $24,032.03

## 1399 South Idalia Street - Roof

| Item | Description | QTY | U of M | Cost | Sub Total | Line Total |
|------|-------------|-----|--------|------|-----------|-----------|
| | **Metal Flashing** | | | | | |
| 42 | R & R Drip Edge | 508 | L.F. | $1.88 | | $955.04 |
| 43 | R & R End Wall | 46 | L.F. | $5.83 | | $268.18 |
| 44 | R & R Side Wall | 50 | L.F. | $4.94 | | $247.00 |
| | **Roof Penetrations** | | | | | |
| 45 | R & R Roof Jack | 9 | Ea. | $65.00 | | $585.00 |
| 46 | R & R Turtle Vent | 17 | Ea. | $79.85 | | $1,357.45 |
| 47 | R & R Dryer Vent Cap | 4 | Ea. | $30.00 | | $120.00 |
| 48 | R & R Furnace Vent (Small) | 4 | Ea. | $69.00 | | $276.00 |
| 49 | R & R Furnace Vent (Medium) | 2 | Ea. | $99.00 | | $198.00 |
| | **Underlayment** | | | | | |
| 50 | R & R 15# | 50 | Sq. | $24.00 | | $1,200.00 |
| 51 | Ice and Water Shield | 1524 | S.F. | $1.69 | | $2,575.56 |
| | **Composite Architectural Shingle** | | | | | |
| 52 | R & R Laminated- 25 Year | 50 | Sq. | $239.00 | | $11,950.00 |
| 53 | Add Nailing Cost For Mansard Roof | 1 | Ea. | 10.00% | | $1,195.00 |
| 54 | Add For Hand Sealing | 5 | Sq. | $40.25 | | $201.25 |
| | **Aluminum Gutters** | | | | | |
| 55 | R & R Gutters & Downspouts | 254 | L.F. | $8.20 | | $2,082.80 |
| 56 | Paint Gutters - 2 Coats | 254 | L.F. | $1.04 | | $264.16 |
| | **Aluminum Soffits** | | | | | |
| 57 | R & R 12" - No Fascia | 254 | L.F. | $1.69 | | $429.26 |

| | | | |
|---|---|---|---|
| | **1399 South Idalia Street - Roof Sub-Total:** | **$23,904.70** | |

## 1399 South Idalia Street - Exterior

| Item | Description | QTY | U of M | Cost | Sub Total | Line Total |
|------|-------------|-----|--------|------|-----------|-----------|
| | **Aluminum Siding** | | | | | |
| 58 | R & R 8" Non-Insulated | 1036 | S.F. | $5.12 | | $5,304.32 |
| 59 | R & R WRB - Tyvek | 1036 | S.F. | $0.71 | | $735.56 |
| | **Aluminum Trim** | | | | | |
| 60 | R & R Aluminum Trim | 340 | L.F. | $1.69 | | $574.60 |
| | **Balcony** | | | | | |
| 61 | R & R Treated Railing and Trim - 2" x 2" | 28 | L.F. | $2.10 | | $58.80 |
| | **Site Work** | | | | | |
| | **Fencing** | | | | | |
| 62 | R & R Red Cedar Fencing- 6' | 75 | L.F. | $41.85 | | $3,138.75 |
| | **Air Conditioning** | | | | | |
| 63 | R & R 2.5 Ton Self Contained Unit | 4 | Ea. | $3,555.00 | | $14,220.00 |

| | | | |
|---|---|---|---|
| | **1399 South Idalia Street - Exterior Sub-Total:** | **$24,032.03** | |

## 15504 East Wyoming - Roof

| Item | Description | QTY | U of M | Cost | Sub Total | Line Total |
|------|-------------|-----|--------|------|-----------|-----------|
| | **Metal Flashing** | | | | | |
| 64 | R & R Drip Edge | 420 | L.F. | $1.88 | | $789.60 |
| 65 | R & R End Wall | 198 | L.F. | $5.83 | | $1,154.34 |
| 66 | R & R Side Wall | 143 | L.F. | $4.94 | | $706.42 |
| 67 | R & R Parapet Flashing - 12" Wide | 476 | L.F. | $6.76 | | $3,217.76 |

**Parapet Wall**

| 68 | Carpenter - Per Hour | 40 Hr. | $53.75 | | $2,150.00 |
|----|----------------------|--------|--------|---|-----------|
| | *Install 8 Additional Scuppers and Increase Parapet Height 10" | | | | |

**Roof Penetrations**

| 69 | Detach & Reset Satellite Dish | 3 Ea. | $135.00 | | $405.00 |
|----|-------------------------------|-------|---------|---|---------|
| 70 | R & R Roof Jack | 36 Ea. | $65.00 | | $2,340.00 |
| 71 | R & R Furnace Vent (Small) | 8 Ea. | $69.00 | | $552.00 |
| 72 | R & R Furnace Vent (Medium) | 8 Ea. | $99.00 | | $792.00 |
| 73 | R & R Furnace Vent (Large) | 4 Ea. | $125.00 | | $500.00 |
| 74 | R & R Chimney Cap (Large) | 4 Ea. | $135.00 | | $540.00 |

**Underlayment**

| 75 | R & R 30# | 104 Sq. | $30.60 | | $3,182.40 |
|----|-----------|---------|--------|---|-----------|

**Rolled Roofing**

| 76 | R & R 90 lb. | 61 Sq. | $101.00 | | $6,161.00 |
|----|--------------|--------|---------|---|-----------|

**Cedar Shake Shingle**

| 77 | R & R 18" Straight Split Cedar Shake | 43 Sq. | $580.00 | | $24,940.00 |
|----|--------------------------------------|--------|---------|---|------------|

**Insulation**

| 78 | | | | | |
|----|---|---|---|---|---|
| | R & R 1/2" Ridgeboard (Coverboard) Insulation | 5587 S.F. | $1.06 | | $5,922.22 |
| 79 | Install 5" Tapered EPS Insulation | 56 Sq. | $234.50 | | $13,132.00 |
| 80 | Engineering Fee | 1 Ea. | $4,500.00 | | $4,500.00 |

**Aluminum Gutters**

| 81 | R & R Gutters & Downspouts | 420 L.F. | $8.20 | | $3,444.00 |
|----|----------------------------|----------|-------|---|-----------|
| 82 | | | | | |
| | Install Comercial Open Front Downspout - 22' | 8 Ea. | $282.92 | | $2,263.36 |
| 83 | Add Cost For Through Mansard Roof | 8 Ea. | $250.00 | | $2,000.00 |

**Cedar Soffits**

| 84 | Prep and Paint 18" w/ Fascia | 340 L.F | $1.62 | | $550.80 |
|----|------------------------------|---------|-------|---|---------|

| **15504 East Wyoming - Roof Sub-Total:** | **$79,242.90** |
|---|---|

## 15504 East Wyoming - Exterior

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|------|-------------|------------|------|-----------|------------|
| | **Cedar Trim** | | | | |
| 85 | Scrape and Paint - 2 Coats | 340 L.F. | $1.05 | | $357.00 |
| | **Site Work** | | | | |
| | **Fencing** | | | | |
| 86 | R & R Red Cedar Fencing- 6' | 160 L.F. | $41.85 | | $6,696.00 |
| | **Air Conditioning** | | | | |
| 87 | R & R 2.5 Ton Self Contained Unit | 6 Ea. | $3,555.00 | | $21,330.00 |

| **15504 East Wyoming - Exterior Sub-Total:** | **$28,383.00** |
|---|---|

## 15554 East Wyoming - Roof

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|------|-------------|------------|------|-----------|------------|
| | **Metal Flashing** | | | | |
| 88 | R & R Drip Edge | 420 L.F. | $1.88 | | $789.60 |
| 89 | R & R End Wall | 198 L.F. | $5.83 | | $1,154.34 |
| 90 | R & R Side Wall | 143 L.F. | $4.94 | | $706.42 |
| 91 | R & R Parapet Flashing - 12" Wide | 476 L.F. | $6.76 | | $3,217.76 |
| | **Parapet Wall** | | | | |
| 92 | Carpenter - Per Hour | 40 Hr. | $53.75 | | $2,150.00 |
| | *Install 8 Additional Scuppers and Increase Parapet Height 10" | | | | |
| | **Roof Penetrations** | | | | |
| 93 | R & R Roof Jack | 36 Ea. | $65.00 | | $2,340.00 |

| | | | | | |
|---|---|---|---|---|---|
| 94 | R & R Furnace Vent (Small) | 8 Ea. | $69.00 | | $552.00 |
| 95 | R & R Furnace Vent (Medium) | 8 Ea. | $99.00 | | $792.00 |
| 96 | R & R Furnace Vent (Large) | 4 Ea. | $125.00 | | $500.00 |
| 97 | R & R Chimney Cap (Large) | 4 Ea. | $135.00 | | $540.00 |
| | **Underlayment** | | | | |
| 98 | R & R 30# | 104 Sq. | $30.60 | | $3,182.40 |
| | **Rolled Roofing** | | | | |
| 99 | R & R 90 lb. | 61 Sq. | $101.00 | | $6,161.00 |
| | **Cedar Shake Shingle** | | | | |
| 100 | R & R 18" Straight Split Cedar Shake | 43 Sq. | $580.00 | | $24,940.00 |
| | **Insulation** | | | | |
| 101 | | | | | |
| | R & R 1/2" Ridgeboard (Coverboard) Insulation | 5587 S.F. | $1.06 | | $5,922.22 |
| 102 | Install 5" Tapered EPS Insulation | 56 Sq. | $234.50 | | $13,132.00 |
| 103 | Engineering Fee | 1 Ea. | $4,500.00 | | $4,500.00 |
| | **Aluminum Gutters** | | | | |
| 104 | R & R Gutters & Downspouts | 420 L.F. | $8.20 | | $3,444.00 |
| 105 | | | | | |
| | Install Comercial Open Front Downspout - 22' | 8 Ea. | $282.92 | | $2,263.36 |
| 106 | Add Cost For Through Mansard Roof | 8 Ea. | $250.00 | | $2,000.00 |
| | **Cedar Soffits** | | | | |
| 107 | Prep and Paint 18" w/ Fascia | 340 L.F | $1.62 | | $550.80 |

| | | |
|---|---|---|
| **15554 East Wyoming Roof - Sub-Total:** | | **$78,837.90** |

## 15554 East Wyoming - Exterior

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Cedar Trim** | | | | |
| 108 | Scrape and Paint - 2 Coats | 340 L.F. | $1.05 | | $357.00 |
| | **Site Work** | | | | |
| | **Fencing** | | | | |
| 109 | R & R Red Cedar Fencing- 6' | 160 L.F. | $41.85 | | $6,696.00 |
| | **Air Conditioning** | | | | |
| 110 | R & R 2.5 Ton Self Contained Unit | 6 Ea. | $3,555.00 | | $21,330.00 |

| | | |
|---|---|---|
| **15554 East Wyoming - Exterior  Sub-Total:** | | **$28,383.00** |

## 15564 East Wyoming - Roof

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Metal Flashing** | | | | |
| 111 | R & R Drip Edge | 508 L.F. | $1.88 | | $955.04 |
| 112 | R & R End Wall | 46 L.F. | $5.83 | | $268.18 |
| 113 | R & R Side Wall | 50 L.F. | $4.94 | | $247.00 |
| | **Roof Penetrations** | | | | |
| 114 | R & R Roof Jack | 10 Ea. | $65.00 | | $650.00 |
| 115 | R & R Turtle Vent | 8 Ea. | $79.85 | | $638.80 |
| 116 | R & R Dryer Vent Cap | 14 Ea. | $30.00 | | $420.00 |
| 117 | R & R Furnace Vent (Medium) | 4 Ea. | $99.00 | | $396.00 |
| | **Underlayment** | | | | |
| 118 | R & R 15# | 50 Sq. | $24.00 | | $1,200.00 |
| 119 | Ice and Water Shield | 1524 S.F. | $1.69 | | $2,575.56 |
| | **Composite Architectural Shingle** | | | | |
| 120 | R & R Laminated- 25 Year | 50 Sq. | $239.00 | | $11,950.00 |
| 121 | Add Nailing Cost For Mansard Roof | 1 Ea. | 10.00% | | $1,195.00 |
| 122 | Add For Hand Sealing | 5 Sq. | $40.25 | | $201.25 |

| | | | | | |
|---|---|---|---|---|---|
| | **Aluminum Gutters** | | | | |
| 123 | R & R Gutters & Spouts | 254 L.F. | $8.20 | | $2,082.80 |
| 124 | Paint Gutters - 2 Coats | 254 L.F. | $1.04 | | $264.16 |
| | **Aluminum Soffits** | | | | |
| 125 | R & R 12" - No Fascia | 254 L.F. | $1.69 | | $429.26 |

| **15564 East Wyoming Roof - Sub-Total:** | **$23,473.05** |
|---|---|

## 15564 East Wyoming - Exterior

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Aluminum Siding** | | | | |
| 126 | R & R 8" Non-Insulated | 1036 S.F. | $5.12 | | $5,304.32 |
| 127 | R & R WRB - Tyvek | 1036 S.F. | $0.71 | | $735.56 |
| | **Aluminum Trim** | | | | |
| 128 | R & R Aluminum Trim | 340 L.F. | $1.69 | | $574.60 |
| | **Balcony** | | | | |
| 129 | R & R Treated Railing and Trim - 2" x 2" | 28 L.F. | $2.10 | | $58.80 |
| | **Site Work** | | | | |
| | Fencing | | | | |
| 130 | R & R Red Cedar Fencing- 6' | 75 L.F. | $41.85 | | $3,138.75 |
| | **Air Conditioning** | | | | |
| 131 | R & R 2.5 Ton Self Contained Unit | 4 Ea. | $3,555.00 | | $14,220.00 |

| **15564 East Wyoming - Exterior Sub-Total:** | **$24,032.03** |
|---|---|

## 15574 East Wyoming - Roof

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Metal Flashing** | | | | |
| 132 | R & R Drip Edge | 508 L.F. | $1.88 | | $955.04 |
| 133 | R & R End Wall | 46 L.F. | $5.83 | | $268.18 |
| 134 | R & R Side Wall | 50 L.F. | $4.94 | | $247.00 |
| | **Roof Penetrations** | | | | |
| 135 | R & R Roof Jack | 8 Ea. | $65.00 | | $520.00 |
| 136 | R & R Turtle Vent | 8 Ea. | $79.85 | | $638.80 |
| 137 | R & R Dryer Vent Cap | 9 Ea. | $30.00 | | $270.00 |
| 138 | R & R Furnace Vent (Medium) | 6 Ea. | $99.00 | | $594.00 |
| | **Underlayment** | | | | |
| 139 | R & R 15# | 50 Sq. | $24.00 | | $1,200.00 |
| 140 | Ice and Water Shield | 1524 S.F. | $1.69 | | $2,575.56 |
| | **Composite Architectural Shingle** | | | | |
| 141 | R & R Laminated- 25 Year | 50 Sq. | $239.00 | | $11,950.00 |
| 142 | Add Nailing Cost For Mansard Roof | 1 Ea. | 10.00% | | $1,195.00 |
| 143 | Add For Hand Sealing | 5 Sq. | $40.25 | | $201.25 |
| | **Aluminum Gutters** | | | | |
| 144 | R & R Gutters & Downspouts | 254 L.F. | $8.20 | | $2,082.80 |
| 145 | Paint Gutters - 2 Coats | 254 L.F. | $1.04 | | $264.16 |
| | **Aluminum Soffits** | | | | |
| 146 | R & R 12" - No Fascia | 254 L.F. | $1.69 | | $429.26 |

| **15574 East Wyoming - Roof Sub-Total:** | **$23,391.05** |
|---|---|

## 15574 East Wyoming - Exterior

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Aluminum Siding** | | | | |
| 147 | R & R 8" Non-Insulated | 1036 S.F. | $5.12 | | $5,304.32 |
| 148 | R & R WRB - Tyvek | 1036 S.F. | $0.71 | | $735.56 |
| | **Aluminum Trim** | | | | |
| 149 | R & R Aluminum Trim | 340 L.F. | $1.69 | | $574.60 |
| | **Balcony** | | | | |
| 150 | R & R Treated Railing and Trim - 2" x 2" | 28 L.F. | $2.10 | | $58.80 |
| | **Site Work** | | | | |
| | Fencing | | | | |
| 151 | R & R Red Cedar Fencing- 6' | 75 L.F. | $41.85 | | $3,138.75 |
| | **Air Conditioning** | | | | |
| 152 | R & R 2.5 Ton Self Contained Unit | 4 Ea. | $3,555.00 | | $14,220.00 |

**15574 East Wyoming - Exterior Sub-Total:** $24,032.03

## 15579 East Wyoming - Roof

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Metal Flashing** | | | | |
| 153 | R & R Drip Edge | 508 L.F. | $1.88 | | $955.04 |
| 154 | R & R End Wall | 46 L.F. | $5.83 | | $268.18 |
| 155 | R & R Side Wall | 50 L.F. | $4.94 | | $247.00 |
| | **Roof Penetrations** | | | | |
| 156 | Detach & Reset Satellite Dish | 1 Ea. | $135.00 | | $135.00 |
| 157 | R & R Roof Jack | 10 Ea. | $65.00 | | $650.00 |
| 158 | R & R Turtle Vent | 6 Ea. | $79.85 | | $479.10 |
| 159 | R & R Dryer Vent Cap | 12 Ea. | $30.00 | | $360.00 |
| 160 | R & R Furnace Vent (Medium) | 6 Ea. | $99.00 | | $594.00 |
| | **Underlayment** | | | | |
| 161 | R & R 15# | 50 Sq. | $24.00 | | $1,200.00 |
| 162 | Ice and Water Shield | 1524 S.F. | $1.69 | | $2,575.56 |
| | **Composite Architectural Shingle** | | | | |
| 163 | R & R Laminated- 25 Year | 50 Sq. | $239.00 | | $11,950.00 |
| 164 | Add Nailing Cost For Mansard Roof | 1 Ea. | 10.00% | | $1,195.00 |
| 165 | Add For Hand Sealing | 5 Sq. | $40.25 | | $201.25 |
| | **Aluminum Gutters** | | | | |
| 166 | R & R Gutters & Downspouts | 254 L.F. | $8.20 | | $2,082.80 |
| 167 | Paint Gutters - 2 Coats | 254 L.F. | $1.04 | | $264.16 |
| | **Aluminum Soffits** | | | | |
| 168 | R & R 12" - No Fascia | 254 L.F. | $1.69 | | $429.26 |

**15579 East Wyoming - Roof Sub-Total:** $23,586.35

## 15594 East Wyoming - Exterior

| Item | Description | QTY U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|
| | **Aluminum Siding** | | | | |
| 169 | R & R 8" Non-Insulated | 1036 S.F. | $5.12 | | $5,304.32 |
| 170 | R & R WRB - Tyvek | 1036 S.F. | $0.71 | | $735.56 |
| | **Aluminum Trim** | | | | |
| 171 | R & R Aluminum Trim | 340 L.F. | $1.69 | | $574.60 |
| | **Balcony** | | | | |
| 172 | R & R Treated Railing and Trim - 2" x 2" | 28 L.F. | $2.10 | | $58.80 |
| | **Site Work** | | | | |
| | Fencing | | | | |
| 173 | R & R Red Cedar Fencing- 6' | 75 L.F. | $41.85 | | $3,138.75 |

### Air Conditioning

| | | | | | |
|---|---|---|---|---|---|
| 174 | R & R 2.5 Ton Self Contained Unit | 4 Ea. | $3,555.00 | | $14,220.00 |

| | | | |
|---|---|---|---|
| **15594 East Wyoming - Exterior Sub-Total:** | | $24,032.03 | |

## General Conditions

| Item | Description | QTY | U of M | Cost | Sub Total | Line Total |
|---|---|---|---|---|---|---|
| | **Construction Set Up- Staging & Monitoring** | | | | | |
| 175 | Initial Set-up, Cleaning & Staging | 1 | Ea. | $1,500.00 | | $1,500.00 |
| 176 | Progressive Set-up, Cleaning & Staging | 1 | Ea. | $1,500.00 | | $1,500.00 |
| 177 | Scaffolding - 17' to 21' High, 30" Wide, 7' Long (Per Month) | 48 | Ea. | $93.50 | | $4,488.00 |
| 178 | Temporary Storage | 2 | Week | $275.00 | | $550.00 |
| 179 | Site Superintendent | 80 | Hr. | $92.00 | | $7,360.00 |
| 180 | Site Monitor (1) | 80 | Hr. | $45.00 | | $3,600.00 |
| 181 | Fencing | 100 | L.F. | $4.72 | | $472.00 |
| | **Temporary Utilities** | | | | | |
| 182 | Chemical Toilet | 2 | Week | $73.50 | | $147.00 |
| 183 | Dumpster Rental | 2 | Week | $685.00 | | $1,370.00 |
| | **Construction Clean-up** | | | | | |
| 184 | Final Interior | 4435 | S.F. | $0.28 | | $1,241.80 |
| 185 | Final Exterior | 21000 | S.F. | $0.28 | | $5,880.00 |

| | | |
|---|---|---|
| **General Conditions Sub-Total:** | $28,108.80 | |

## Estimate Totals:

| | | |
|---|---|---|
| 186 | **Sub - Total** | $528,255.83 |
| 187 | **Overhead** | $52,825.58 |
| 188 | **Profit** | $52,825.58 |
| 189 | **Construction Permits** 1.50% | $7,923.84 |
| 190 | **Project Total** | **$641,830.83** |

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2

 3    Civil Action No. 1:14-cv-03226-REB-KLM

 4    _____

      DEPOSITION OF:  THOMAS J. IRMITER - November 29, 2016
 5    _____

 6    MANCHESTER PLACE HOA, INC.,

 7    Plaintiff,

 8    v.

 9    OWNERS INSURANCE COMPANY, an Ohio corporation,

10    Defendant.

11    _____

              PURSUANT TO NOTICE, the deposition of
12    THOMAS J. IRMITER was taken on behalf of the Defendant
      at 6465 Greenwood Plaza Boulevard, Suite 650,
13    Englewood, Colorado 80111, on November 29, 2016, at
      10:19 a.m., before Lori A. Martin, Registered Merit
14    Reporter, Certified Realtime Reporter, and Notary
      Public within Colorado.
15

16

17

18

19

20

21

22

23

24

25
```

**H+G**

Hunter + Geist, Inc.

303.832.5966     1900 Grant Street, Suite 1025     ▪ www.huntergeis[...]
800.525.8490     Denver, CO 80203                   ▪ scheduling@hunt[...]

Your Partner in Making the Record

EXHIBIT

B

**THOMAS J. IRMITER - 11/29/2016**
**Manchester Place HOA, Inc. v. Owners Insurance Company**

33

1  think is your estimate.
2      (Deposition Exhibit 2 was marked.)
3      Q.  And, Mr. Irmiter, you've been handed
4  what's been marked as Exhibit 2.  Could you please take
5  a look at that document and tell me if you recognize
6  it.
7      A.  Yes, I do.
8      Q.  And what is it?
9      A.  This is a preliminary estimate that was
10  prepared by me on September 16, 2014.
11      Q.  And why is it a preliminary estimate?
12      A.  As we indicated, we'd always like more
13  discovery, so we -- I think it reserves the right to
14  put together additional -- another estimate if, in
15  fact, we did more work, so . . .
16      Q.  Okay.  And we discussed earlier that you
17  have not put together a subsequent estimate; is that
18  right?
19      A.  That's correct, and -- but we don't
20  anticipate at this point doing that.
21      Q.  So I'd like to ask you a couple of
22  questions about the estimate.  First, it does say it
23  was approved by you.  Do you see that?
24      A.  Yes.
25      Q.  And it says it was prepared by Jim

34

1  Irmiter.  Do you see that?
2      A.  Yes.
3      Q.  And am I correct that Jim is your son?
4      A.  He is, yes.
5      Q.  And is it your recollection that he
6  prepared this and that then you subsequently approved
7  it?
8      A.  Well, it's a mislabel of how that actually
9  works.  What Jim does -- and we have since actually
10  changed that to say that Jim -- the data for the
11  estimate was entered by Jim or Kevin or whoever, and
12  that the estimate is prepared by me.
13      So what Jim basically did is he went
14  through and set the estimate template up.  So for
15  1379 South -- Street - Roof, he would set up the metal
16  flashing, the roof penetrations, the underlayment, the
17  composite materials based on what was there or based on
18  what -- based -- I'm sorry, based on what's there, all
19  right?
20      I would then go through and I would say,
21  Wait a minute, you need to add ice and water, you need
22  to do this, you need to do that.  He would add those
23  items.  He would then do the lineal footage quantities.
24      And then because we are using three
25  different estimating databases to come up with a

35

1  combined or average price, if you will, he would then
2  prepare for me, off of those databases, the lineal foot
3  price for drip edge.  So Xactimate, at that point in
4  time, might be a buck 92.  RSMeans might be a buck 60,
5  and Bid4Build might be, you know, a buck 79.  And we
6  would take those and do an average price.  We wouldn't,
7  for example, take the -- the highest price.
8      And an example of that, if these were EPDM
9  roofs, we would use the Bid4Build price for EPDM,
10  because I personally believe, based on my experience
11  and having owned a construction company, that the EPDM
12  price in Xactimate is greatly inflated; it's way higher
13  than it needs to be.  So we'll use what we think is a
14  reasonable price.  So we think this -- by doing it that
15  way, we're getting to a fair market price for the
16  project.
17      Q.  So if I could back up on that.
18      A.  Yeah.
19      Q.  I'm not sure I quite heard what you said
20  on the EPDM example that you gave.
21      A.  Yeah.
22      Q.  So if you thought that Xactimate was
23  particularly inflated on a particular item, how would
24  you come to the price that you used?
25      A.  I would use one of the other databases,

36

1  one that I thought was more realistic.
2      Q.  So you wouldn't necessarily take an
3  average of the three on a particular line item if you
4  thought that a particular software program was way off?
5      A.  Exactly.
6      Q.  And --
7      A.  Well -- and understand, if I can, the
8  other -- the other piece of that is then we also take a
9  look at the total number of square, the total price for
10  the roof, and we'll take a look at what is the price
11  for that square.  So if all of a sudden it's adding up
12  to a thousand dollars a square to do a roof that you
13  know in this marketplace you can get done at 375, why
14  would you put a thousand dollars a square in?  That's
15  ridiculous.  Just because the database shows you to do
16  that.  So, again, there is a practicality that we try
17  to add to this, all right?
18      Q.  So did you record anywhere which one of
19  these line items were not the products of an average of
20  those three software programs?
21      A.  No.  I don't keep those notes.  I could
22  certainly go back and re-create that, based on the --
23  the three programs that we have at the office, but, no,
24  I did not.
25      Q.  So let's talk about those three programs

9 (Pages 33 to 36)

THOMAS J. IRMITER - 11/29/2016
Manchester Place HOA, Inc. v. Owners Insurance Company

37

1  for a moment.  First -- the first one you list is
2  Xactimate, correct?
3       A.  Yes.
4       Q.  And what is Xactimate?  Who puts it
5  together, that sort of stuff?
6       A.  Well, Xactimate is a unit price database
7  that is essentially utilized by the insurance industry
8  and contractors to price repair on these kinds of
9  projects.  They have quarterly updates, they have
10 geographic locations, so the price per square to
11 install a roof in Winter Park, for example, is going to
12 be much higher than it is in Denver because of the
13 labor shortages that you have up there.  And it takes
14 those kinds of things into account.
15      It's also updated sometimes weekly in
16 large catastrophic loss locations where prices can
17 fluctuate greatly.  I don't know if that answers your
18 question.
19      Q.  It does, thank you.
20      A.  Yeah.
21      Q.  So the same sort of question with respect
22 to Bid4Build.  And in particular, do you know who
23 creates or maintains the Bid4Build program?
24      A.  The people who own Bid4Build.  No, I can't
25 put names to the people that do that, but --

38

1       Q.  Okay.  And is it also a unit pricing type
2  of tool?
3       A.  Yes.
4       Q.  And then same sort of questions for
5  RSMeans.  Do you know how -- who maintains it and is it
6  also a unit pricing?
7       A.  Yes, it's also unit pricing.
8       Q.  And do you know who maintains that or
9  created that?
10      A.  RSMeans does, yeah.
11      Q.  Okay.  In your experience, do you see
12 contractors using all three of these software programs?
13      A.  I see the -- I see contractors who do not
14 work in the storm restoration business utilizing
15 Bid4Build.  These would be more remodeling
16 restoration contractors.  So I think in some cases, it
17 has actually a little more realistic pricing to it and
18 it tends to be a little bit less.
19      Anybody who knows anything about Xactimate
20 knows that on every one of their line items, there is
21 markup, okay?  Built into the line item, markups.  And
22 so that's the other thing you have to understand when
23 you use these databases is, is there internal markup on
24 that number or not when you're making those
25 comparisons, so . . .

39

1       Q.  What about RSMeans?  Is that something
2  that you see contractors in the field using?
3       A.  Yes.  More on a commercial level, though.
4  It's a better commercial product.
5       Q.  Would you -- would you consider this job
6  to be a commercial project or something else?
7       A.  Well, it's -- in terms of its
8  applicability -- code application, it's a residential.
9  But because of the number of units, it would be
10 considered a commercial building, yes.
11      Q.  Okay.  And what about Xactimate?  Is
12 Xactimate intended for commercial project use?
13      A.  It's a better utilization for residential,
14 but they do have some commercial applications.  One of
15 the problems that I see using Xactimate with
16 residential is -- or with commercial is that oftentimes
17 contractors and adjusters will put flashings in that
18 are residential in terms of their -- their size and
19 their thickness and their gauge instead of using the
20 commercial products, and that is less per square -- per
21 square foot.
22      Q.  Have you ever perceived any issues with
23 programs like Xactimate that may be intended more for
24 residential properties failing to account for the
25 pricing advantages of economies of scale on a large

40

1  commercial project?
2       A.  Yes.
3       Q.  In addition to the three software
4  programs, this paragraph on page 1 of your report, it
5  says takes an average of those three databases and, it
6  says, "and information provided by local vendors and
7  suppliers in the geographic location."  Do you see
8  that?
9       A.  Yes.
10      Q.  And so did you, in fact, take into account
11 information provided by local vendors and suppliers in
12 the geographic location of this loss?
13      A.  Not in this case.  Some cases will have --
14 will -- they're very old and we'll get -- the file will
15 have estimates in there from three or four or five
16 contractors, some for the carrier, some for the -- the
17 building owner, and we'll utilize that information,
18 because it's there, to take a look at what they're
19 saying.
20      Q.  Does someone at FBS separately run each of
21 these line items through Xactimate, Bid4Build and
22 RSMeans in creating a report like this?
23      A.  No.  We don't run three individual
24 estimates.  We pull out the individual unit costs in
25 groups and compare them that way.

10 (Pages 37 to 40)

**41**

1   Q.  And so, in other words, the -- what you do
2   is you -- instead of saying how much does 508 linear
3   feet of R and R drip edge cost or what will that price
4   out at each -- on these three software programs, you
5   take an aggregation of the three prices for that item
6   and then just do the math yourself?
7   A.  No.  On a separate notebook like this one
8   in front of you here, we'll actually just pull up R and
9   R drip edge on the three and then write down three
10  columns, okay?  And we'll just write the number down.
11  We'll do that for each one of these items that are
12  independent items, and then we'll do the -- and then
13  we'll do the comparison that way, yeah.
14  Q.  And did you make -- did you keep that list
15  of the prices in this case?
16  A.  No.
17  MR. HALL:  Why don't we go ahead and take
18  a quick break, if you don't mind.  Let's go off the
19  record, please.
20  (Recess taken, 11:03 a.m. to 11:13 a.m.,
21  after which time Ms. Wheeler was not present.)
22  Q.  (BY MR. HALL)  And, Mr. Irmiter, we are
23  back on the record.  How did you coordinate times and
24  dates to go out to inspect the property?  Did you talk
25  to the HOA or did Mr. Ridulfo do that, or how did that

**42**

1   work?
2   A.  No, when we get an assignment and we get
3   through the pricing and the agreement put in place, I'm
4   thinking about that time frame -- back then, it still
5   would have been Bridgett Smith, who is our internal
6   operations person, would then reach out to the HOA and
7   schedule it, yeah.
8   Q.  Did anyone ever talk to you or, to your
9   knowledge, anybody at FBS about setting up a joint
10  inspection with an engineer hired by the insurance
11  company?
12  A.  No, I'm not aware of that.
13  Q.  Previously we were talking about the fact
14  that you had asked for board meeting minutes.
15  A.  Yes.
16  Q.  And you said you didn't receive them.  Do
17  you recall who you asked for those or who FBS asked for
18  those?
19  A.  Probably Loree.
20  Q.  The counsel for the HOA?
21  A.  Yeah.
22  Q.  Did you -- you probably already told me
23  this, and I apologize, but did you go out to inspect
24  with Mr. Johnson at some point?  Were you out there the
25  same date?

**43**

1   A.  Yes, we were both there on June 26.
2   Q.  Okay.  And how long was he there for that
3   day?
4   A.  We were there for a full day.
5   Q.  You guys were both there together?
6   A.  Yes.
7   Q.  And I think you mentioned you took some
8   photographs?
9   A.  Yes.
10  Q.  And did Mr. Johnson as well?
11  A.  Yes.
12  Q.  And did you guys take any measurements or
13  anything like that?
14  A.  Well, we measured the distance from the
15  edge of the roof in two directions to locate the -- on
16  a map later or for the report, the core cuts.
17  Q.  Okay.
18  A.  Yeah.  That would have been the only
19  measuring, really, that we would have done.
20  Q.  And when were the core samples taken?
21  A.  It was the 26th.
22  Q.  That same day?
23  A.  Yes.
24  Q.  And did you personally do those or who did
25  those?

**44**

1   A.  I remember cranking down on one of them,
2   and I think I made Brian do the other two.
3   Q.  I think earlier, or maybe it was in your
4   report somewhere, you talk about some Haag standard.
5   Does that sound familiar, that you would talk about
6   Haag?
7   A.  I think we referenced the Haag Residential
8   Inspector's Manual or course.
9   Q.  Okay.
10  A.  I know that Brian Johnson took the
11  residential and commercial course --
12  Q.  Okay.
13  A.  -- and was certified at that time by Haag,
14  and then Ryan Nierengarten has also taken that course.
15  Q.  And, in your experience, is the training
16  that Haag provides reasonable and reliable?
17  A.  No.
18  Q.  And why not?
19  A.  It's a great course for someone to sit in
20  who knows nothing about roofing products and the means
21  and methods of installing those products and looking
22  for defective installation of those kinds of products.
23  That is the first three days of the course.  The last
24  day of the course focuses on storm-related damages.  I
25  should say the first three days also focus very heavily

11 (Pages 41 to 44)