**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 14-cv-03226-REB-STV

MANCHESTER PLACE HOA, INC.,

      Plaintiff,

vs.

OWNERS INSURANCE COMPANY, an Ohio corporation,

      Defendant.

## ORDER DENYING MOTION TO STRIKE  EXPERT TESTIMONY

**Blackburn, J.**

      The matter before me is **Owners Insurance Company's Motion To Strike Expert Opinion Testimony of Thomas Irmiter** [#111][1] filed March 14, 2017.  The plaintiff filed a response [#102], and Owners filed a reply [#112].[2]  I deny the motion.

### I.  JURISDICTION

      I have jurisdiction over this case under 28 U.S.C. § 1332 (diversity of citizenship).

### II.  STANDARD OF REVIEW

      The defendant, Owners Insurance Company, asks the court to strike the expert opinion testimony of Thomas Irmiter, an expert witness endorsed by the plaintiff,

---

    [1]  "[#111]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

    [2]  Initially, the motion to strike [#111] was filed as an attachment to the motion [#96] of Owners to file its motion to strike out of time. I granted the motion [#96] to file out of time and the plaintiff then filed its response [#102] to the motion to strike.  However, the motion to strike [#111] was not entered on the docket as a separate filing until March 14, 2017.  Thus, the motion to strike [#111] has a higher docket number than the response.

Manchester Place HOA, Inc.  Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert witness testimony, provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  As interpreted by the Supreme Court, Rule 702 requires that an expert's testimony be both reliable, in that the witness is qualified to testify regarding the subject, and relevant, in that it will assist the trier in determining a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92, 113 S.Ct. 2786, 2795-96, 125 L.Ed.2d 469 (1993); *Truck Insurance Exchange v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004).  The Supreme Court has described the court's role in weighing expert opinions against these standards as that of a "gatekeeper."  *See Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 1174, 142 L.Ed.2d 248 (1999).

Under *Daubert* and its progeny, an expert opinion is reliable if it is based on scientific knowledge.  "The adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly the word 'knowledge' connotes more than subjective belief or unsupported speculation."  *Daubert*, 113 S.Ct. at 2795.  In short, the touchstone of reliability is "whether the reasoning or methodology underlying the testimony is scientifically valid."  *Id*.

The Tenth Circuit employs a two-step analysis when considering the admissibility of expert testimony under Rule 702.  *See 103 Investors I, L.P. v. Square D Co.*, 470

F.3d 985, 990 (10th Cir.2006).  The first is codified in Rule 702(a) and examines whether the expert "is qualified . . . to render an opinion."  *Id*.  The qualifications of Mr. Irmiter are not challenged in the present motion.

The second step of the admissibility analysis, codified in Rules 702(b), (c), and (d), examines "whether the expert's opinion is reliable."  ***103 Investors I***, 470 F.3d at 990.  Pursuant to Rule 702(b), "the proponent of the opinion must show that the witness gathered 'sufficient facts or data' to formulate the opinion."  ***Crabbe***, 556 F.Supp.2d at 1223.  This inquiry calls for a "quantitative rather than qualitative analysis."  ***United States v. Lauder***, 409 F.3d 1254, 1264 n.5 (10th Cir. 2005).

Analysis under Rule 702(c) "involves two related inquires:  (i) what methodology did the witness use to reach the opinion; and (ii) is that methodology generally deemed 'reliable' in the field in which the expert works."  ***Crabbe***, 556 F.Supp.2d at 1222.  "[T]he articulation of a methodology usually can be made without reference to the specific opinion or to any of the specific facts in the case; it is simply an explanation of the process the witness used."  *Id*.  As for reliability, the question is "whether the reasoning or methodology underlying the testimony is scientifically valid."  ***Daubert***, 113 S. Ct. at 2796.  In assessing the reliability of the proffered methodology, the court should consider

> whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community.

*Id*. at 2790.  These factors, however, "are neither exclusive nor dispositive."  ***Crabbe***, 556 F.Supp.2d at 1223.

Finally, Rule 702(d) requires that the expert reliably apply "the principles and methods to the facts of the case." FED. R. EVID. 702(d).  Factors that inform this analysis include, but are not limited to,

> (i) whether the expert employed the same degree of intellectual rigor in formulating the opinion as he or she would be expected to employ in his or her own professional life; (ii) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion (i.e., whether there is too great an analytical gap between the data and the opinion proffered); and (iii) whether the expert adequately accounted for obvious alternative explanations.

*Crabbe*, 556 F.Supp.2d at 1224.  The requirement that the witness reliably apply his methods to the facts "is not an invitation to a court to assess the worth of the opinion itself.  The court's focus is simply upon whether the witness followed the dictates of the methodology in considering the facts and data."  *Id.* at 1223.

Guided by these principles, the trial court has broad discretion in determining whether expert testimony is sufficiently reliable and relevant to be admissible.  *Truck Insurance Exchange*, 360 F.3d at 1210; *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243 (10th Cir. 2000).  The overarching purpose of the court's inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Goebel v. Denver and Rio Grand Western Railroad Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (quoting *Kumho Tire*, 119 S.Ct. at 1176).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 113 S.Ct. at 2798.

### III.  ANALYSIS

This case involves an insurance coverage dispute. The plaintiff, Manchester Place HOA, Inc., is a homeowners association for a condominium development. The defendant, Owners Insurance Company, is an insurance company. Owners issued an insurance policy to Manchester.  That insurance policy was in force on September 11, 2013.  On that date, according to Manchester, a hail and wind storm damaged the roofs of all eight of the Manchester Place condominium buildings.  Manchester contends also that other parts of the buildings were damaged by the storm.

Manchester made a claim on its Owners insurance policy for coverage of the cost to repair the storm damage to the buildings. Owners denied the claim, contending the storm on September 11, 2013, did not cause damage to the Manchester buildings. In its complaint [#5], Manchester asserts claims for breach of insurance contract, common law insurance bad faith, and statutory insurance bad faith.

Manchester endorsed Thomas Irmiter as an expert witness.  Mr. Irmiter prepared a report in which he estimates the cost of repairing the damage to the Manchester buildings.  In its motion [#111], Owners challenges the admissibility of the opinions of Mr. Irmiter under Fed. R. Evid. 702.  Owners challenges the sufficiency of the facts and date used by Mr. Irmiter, the principles and methods used by Mr. Irmiter, and the application of those principles to the facts and data used by Mr. Irmiter. In addition, Owners contends the plaintiff violated Fed. R. Civ. P. 26 because Mr. Irmiter failed to disclose the data on which he relied and the manner in which Mr. Irmiter applied his methods to the data.

## A.  BASIS FOR ESTIMATE

In his report, Mr. Irmiter says his estimate

> was compiled using data collected from the following sources: Exactimate, Bid for Build, and RS Means.  The estimating methodology takes an average of the three data bases and information provided by local vendors and suppliers in the geographic location of the loss.  The purpose of this style of estimate is to maximize the likelihood that a property owner will be able to have repairs performed by a licensed contractor in their geographic area.

*Motion* [#111], Exhibit A (Irmiter Report), p. 1.

At his deposition, Mr. Irmiter testified that Exactimate, Bid for Build, and RS Means are unit pricing databases used to estimate the cost of building repairs and remodeling.  *Motion* [#111], Exhibit B (Irmiter Deposition), 34:24 - 39:21.  He said contractors use these databases when making cost estimates.  *Id*., 37:4 - 39:4.  In his deposition, Mr. Irmiter said he considered for each line item in his estimate the pricing data provided by each of the three databases.  Then, he priced each line item by taking an average of the three prices provided by each database.  However, for some line items, Mr. Irmiter reported, he disregarded pricing information from a particular database if he thought the price suggested in the database was unreasonably high.  *Id*., 35:8 - 36:17.  He did not keep any record of the particular line items on which he excluded pricing information from a particular database.  *Id*., 35:18 - 36:24.  Mr. Irmiter testified also that in developing the Manchester estimate, he did not take into account information provided by local vendors and suppliers.  *Id*., 40:10 - 40:19.

In an affidavit included with the response [#102] of Manchester, Mr. Irmiter describes a somewhat different basis for his cost estimate.  In his affidavit, Mr. Irmiter says he did not use all three databases in developing his estimate.  Rather, he says he relied only on the RS Means database in developing his estimate.  *Response* [#102],

Irmiter Affidavit [#102-1], p. 2.

Owners contends the cost of repair opinion of Mr. Irmiter must be excluded from evidence because his changing description of the bases for his opinions left Owners unable to address at the deposition and at trial the true bases for his opinions.  Further, Owners contends, the shifting description of the bases of the opinion shows the opinion is not reliable.  I disagree.

The RS Means database was always identified by Mr. Irmiter as one of the bases of his opinion.  Now, Mr. Irmiter says RS Means was the sole source of pricing information he used in developing his opinion.  In the end, this simplifies the analysis of the bases of the opinions of Mr. Irmiter.  Because RS Means always has been known as a basis for the opinion of Mr. Irmiter, I find and conclude that Owners is not unduly – let alone irreparably –  prejudiced because Mr. Irmiter has attempted to withdraw consideration of other bases cited initially in his report.

Owners contends also that Mr. Irmiter has not identified an accurate basis for his opinion, has not shown that his opinion is the product of reliable principles and methods, and has not shown that experts in the construction field employ such methods.  Mr. Irmiter testified in his deposition that the RS Means database is used by commercial contractors when making estimates.  *Irmiter Deposition*, 39:1 - 39:4.  He testified the Manchster project properly is considered to be a commercial project.  *Id.*, 39:5 - 39:10.   That foundation is sufficient to show that RS Means is a reasonably accurate basis for this cost estimate.  Mr. Irmiter established that he used reliable principles and methods to develop his opinion when he said that he determined the materials needed to repair the Manchester buildings and then estimated the cost of those materials using a database he considers to be reliable.  Further, Mr. Irmiter

indicates that this method is used by contractors and estimators in his industry.  This shows ostensibly that experts in the construction field employ such methods.

Owners argues also that the plaintiff violated the disclosure requirements of Fed. R. Civ. P. 26 because Mr. Irmiter did not disclose until January of 2017, that RS Means was the only database he used to develop his opinion.  Under Fed. R. Civ. P. 37(c),

> [i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

FED. R. CIV. P. 37(c)(1).  I have broad discretion in determining whether a violation of a party's obligations under Rule 26 is justified or harmless.  ***Woodworker's Supply Inc. v. Principal Mutual Life Insurance Co.***, 170 F.3d 985, 993 (10th Cir. 1999).  Although I need not make explicit findings concerning the matter, the following factors guide my discretion:

> (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.

***Id.***

Here, the shifting – or evolving – statements of Mr. Irmiter concerning the bases for his opinion are far from ideal.  Still, the stated bases for his opinions are not complex and are fairly easy to analyze.  Notably, RS Means has always been identified as a basis for the opinions of Mr. Irmiter.  The primary change in the basis for his opinions is his recent statement that he did not rely on the two other databases cited in his report.  Essentially this simplifies and limits the bases for his opinions.  Given these circumstances, I find that the prejudice to Owners is minimal and curable short of exclusion of the expert or his concomitant opinions.  This is true because RS Means

has always been known to Owners as a basis for the opinions of Mr. Irmiter and the process of developing a cross examination of Mr. Irmiter about RS Means and his recent jettison of the other two databases is relatively straight forward.

## B.  DISCLOSURE OF DATA

In its motion, Owners notes that Mr. Irmiter did not disclose which particular line items involved the exclusion of data from one of the three databases.  Further, Owners notes, Mr. Irmiter did not disclose any basis for excluding one of the databases from particular line items, other than to say that he excluded pricing data which reflected an unreasonably high price.  Of course, this situation has been altered – but not necessarily exacerbated– because Mr. Irmiter now says he relied only on the RS Means database in developing his cost estimate.

Owners contends also that Mr. Irmiter has not adequately disclosed the data on which he relied because he has not disclosed to Owners the content of the RS Means database.  Of course, Mr. Irmiter disclosed in his report and elsewhere that he relied on the RS Means database.  Nothing in the record indicates that Owners though discovery sought to review the content of the RS Means database or any other database.  In the context of this cost estimate, I find that the plaintiff satisfied the disclosure requirements of Rule 26(a)(2), at least as an threshold matter, when Mr. Irmiter represented in his report and elsewhere that he relied on the RS Means database.  Mr. Irmiter disclosed his reliance on this data.   With that disclosure in hand, Owners could have, if it wished, sought in discovery to review the database.

## C.  RELIABILITY OF METHODOLOGY

Owners contends Mr. Irmiter did not disclose any reliable methodology he used when he excluded information from one database in estimating pricing on certain line

items.  In its reply, Owners argues Mr. Irmiter has not disclosed the methodology used by the RS Means database to determine its pricing information.  Further, Owners argues Mr. Irmiter has cited no evidence to show that RS Means is reliable and regularly used in the insurance or construction industries.  I disagree.

In his deposition, Mr. Irmiter said Xactimate is a unit price database and he summarized how the Xactimate database is developed and updated.  *Irmiter Deposition*, 36:25 - 37:18.  Asked about the Bid for Build and RS Means databases, Mr. Irmiter said they too are unit price databases, but he did not know the details of how these databases are assembled and maintained.  *Id*., 37:21 - 40:2.  He testified that RS Means is better used when estimating commercial projects.  *Id*., 39:1 - 39:4.  He said the Manchster project properly is considered to be a commercial project.  *Id*., 39:5 - 39:10.  He noted that the data in Xactimate often is inflated or not appropriate for a commercial project.  *Id*., 38:19 - 39:21. He said contractors in the field use RS Means for estimating commercial projects and that it is "a better commercial product."  *Id*., 39:1 - 39:4.  Addressing his decision to exclude from his analysis certain price information as to certain line items, Mr. Irmiter testified that he would exclude from his analysis price information which he knew to be unreasonable, based on his experience in the industry.  *Id*., 35:22 - 36:17.

Although in summary fashion, Mr. Irmiter indicated in his deposition the basics of how data for RS Means is assembled.  In addition, he indicated that he and others in his field consider the RS Means database to be reliable because they use the database when making estimates.  Mr. Irmiter said his decisions to exclude from his analysis certain price information from a database was based on his knowledge and experience in the industry, knowledge or reasonable pricing in the industry, and exclusion of

database information which did not reflect reasonable pricing.   Ideally, the record would contain more information on these topics.  However, on these topics, the information provided by Mr. Irmiter is sufficient to satisfy the requirements of Rule 702.

## IV.  CONCLUSION & ORDER

Owners cites a variety of alleged flaws in the opinions and disclosures of Mr. Irmiter.  While some of these flaws are allegedly significant, they do not render the opinion testimony of Mr. Irmiter inadmissible under Rule 702.  Certain disclosures concerning the opinions of Mr. Irmiter were incomplete and now inconsistent.  Still, the bases for and methodology used in the analysis of Mr. Irmiter have been disclosed sufficiently.  The record does not indicate that Owners will suffer surprise or irreparable prejudice as a result of any actual flaws in his disclosures.  To the extent the opinions expressed by Mr. Irmiter are based on flawed data or flawed analysis, those flaws implicate weight , not admissibility.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 595.  This rule holds true with regard to the opinions of Mr. Irmiter.

**THEREFORE, IT IS ORDERED** that **Owners Insurance Company's Motion To Strike Expert Opinion Testimony of Thomas Irmiter** [#111] is denied.

Dated April 21, 2017, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge

11